UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
| --- | --- | --- |
| | ) | No. 17 CR 239-1 |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| JESSICA O'BRIEN AND MARIA BARTKO, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Defendants Jessica Arong O'Brien and Maria Bartko are charged with engaging in a scheme to defraud that involved causing lenders to issue and refinance loans related to two investment properties that O'Brien owned on the south side of Chicago. The indictment alleges that this scheme was comprised of a series of transactions in 2004, 2005, 2006, and 2007. R. 1 at 4-7. Of particular relevance here, the indictment alleges that in 2007, O'Brien and Bartko agreed that O'Brien would sell her two investment properties to Bartko using "a straw buyer whom O'Brien and Bartko knew would be fraudulently qualified for mortgage loans." *Id.* at 4. Currently before the Court is O'Brien's motion to dismiss the indictment based on purportedly perjured grand jury testimony (R. 131).

Bartko is a cooperating witness who testified before the grand jury in support of the indictment. O'Brien's motion to dismiss focuses on two documents (out of 5,000 pages of documents) produced by O'Brien in response to a government subpoena after Bartko's grand jury testimony but shortly before the return of the

indictment. These documents are both titled "Acknowledgment & Agreements Between [the alleged straw buyer]/Maria Bartko ('Buyers') and Jessica O'Brien ('Seller')" (collectively, "acknowledgements"). R. 131-2, 131-3. Each pertains to one of the two investment properties sold by O'Brien in 2007, and each includes a notary stamp with the name of the closing agent for the 2007 property sales. *Id*. The alleged straw buyer identified his signature on both of the acknowledgements. O'Brien argues that the government should have discovered based on the acknowledgements that Bartko lied to the grand jury regarding O'Brien's intent to conceal, and that the government should have affirmatively corrected the record. On this basis, O'Brien moves to dismiss the indictment.

A federal court may "dismiss an indictment for misconduct before the grand jury" only where the misconduct violates "one of those few, clear rules which were carefully drafted and approved by th[e Supreme] Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46 (1992) (quotation marks omitted). Even if a clearly defined rule is violated, the indictment may be dismissed only if the defendant is prejudiced, meaning that the violation "substantially influenced the grand jury's decision to indict," or "there is grave doubt that the decision to indict was free from [such] influence." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988) (quotation marks omitted).

The Court first analyzes whether O'Brien has shown a violation of a clear rule, and next analyzes whether she has shown prejudice.

**Violation of Clear Rule.** The Seventh Circuit has explained that "knowing use of perjured testimony, amounting to the creation of trumped-up charges, might justify the dismissal of an indictment." *United States v. Fountain*, 840 F.2d 509, 513 (7th Cir. 1988); *see also United States v. Roth*, 777 F.2d 1200, 1203-04 (7th Cir. 1985) (use of evidence "that the government know[s] . . . [wa]s perjured" could justify dismissal if it constitutes "prejudicial misconduct"). But O'Brien acknowledges that the government did not knowingly present false testimony to the grand jury. *See* R. 131 at 2 (conceding that "the Government cannot be held responsible for" alleged perjury by Bartko during her "March 21, 2017 grand jury appearance," before the government knew about the acknowledgements).

O'Brien nevertheless claims that the government had "an affirmative obligation to correct the [allegedly] perjured testimony once it became aware of [it]." *Id.* In support, O'Brien's motion cites *Brady v. Maryland*, 373 U.S. 83 (1963), and case law applying *Brady*. But that case law deals with the government's "affirmative duty to disclose evidence favorable to a defendant and material either to guilt or punishment." *United States v. Bland*, 517 F.3d 930, 933-34 (7th Cir. 2008) (quotation marks omitted). "A successful *Brady* challenge requires a defendant to show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Id.* (quotation marks omitted). As the government correctly points out, O'Brien's argument deals with failure to tell the grand jury about evidence

3

turned over *by O'Brien to the government*, not the government's failure to turn over material evidence to O'Brien.

O'Brien's reply brief shifts focus from *Brady* and progeny to other cases that more directly address a prosecutor's failure to correct what he later discovers to be false grand jury testimony. *See* R. 147 at 2-3 (citing *United States v. Lee*, 2016 WL 4046967, at *15 (S.D. Ill. July 28, 2016) (discussing prosecutor's "fail[ure] to correct what he later learned was false testimony" before the grand jury); *United States v. Udziela*, 671 F.2d 995, 1001 (7th Cir. 1982) (addressing "perjured testimony supporting an indictment . . . discovered before trial"); *United States v. Provenzano*, 440 F. Supp. 561, 565 (S.D.N.Y. 1977) (addressing situation where government's "key witness recanted his prior testimony" before the grand jury)). These cases indicate that a prosecutor's failure to correct perjurious testimony can constitute grand jury misconduct.[1] O'Brien relies in particular on *Provenzano*, where the Southern District of New York dismissed a superseding indictment supported by grand jury testimony that a witness had "recanted." 440 F. Supp. at 565.

Unlike in *Provenzano*, however, Barkto has not recanted her grand jury testimony. Nor has O'Brien proven that Bartko's testimony was perjurious. On this

---

[1] Notably, *Provenzano* and *Udziela* predated the Supreme Court's decision in *Bank of Nova Scotia* and did not apply its prejudice standard for dismissing an indictment based on grand jury misconduct. As the *Lee* court explained, the Seventh Circuit has since made clear that "even if a prosecutor . . . failed to correct what he later learned was false testimony, the indictment should be dismissed" only if it meets the prejudice standard set forth in *Bank of Nova Scotia*. 2016 WL 4046967, at *15 (citing *Bank of Nova Scotia*, 487 U.S. at 254 and *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005)); *see also Vincent*, 416 F.3d at 602 ("To the extent that *Udziela* mandates the dismissal of an indictment without a showing of prejudice, it does not survive *Bank of Nova Scotia*.").

point, O'Brien's briefs paint with a broad brush. A more precise comparison between what the acknowledgements show and what Bartko testified reveals a far less clear picture.

To begin, the acknowledgements indicate that Bartko's identity as a buyer was stated in documents that appear to have been notarized by the closing agent who attended both of the 2007 closings. R. 131-2, 131-3. But Bartko did not testify that her status as buyer was not identified in any document presented to the closing agent—testimony that would constitute perjury. Rather, Bartko testified: "Jessica [O'Brien] told me a few times that we could not talk about the fact that she was paying [the alleged straw buyer] and I to buy the properties from her," and "When [O'Brien] handed me the checks, she reminded me that we could not tell anyone that she had paid me and [the alleged straw buyer] to buy the properties." R. 86-1 at 17, 26. These statements could be true notwithstanding the fact that Bartko's identity as the buyer is stated in the acknowledgements. Indeed, the acknowledgments say nothing about O'Brien paying Bartko and the alleged straw buyer to buy the properties, or about what O'Brien told Bartko about those payments.

O'Brien maintains that the acknowledgements undermine the allegation in the indictment that O'Brien and Bartko "knowingly caused Bartko's status as a buyer to be concealed from lenders," R. 1 ¶ 18, which was supported by Bartko's testimony. But it is unclear whether the acknowledgements ever reached the lenders. A search of CitiMortgage/Citibank's files for the 2007 loans revealed that

5

the acknowledgements were not part of those files. R. 131-4 at 1. Although, as O'Brien points out, closing agents owe fiduciary duties to lenders under Illinois law, *see* R. 147 at 7, it remains to be explored at trial precisely what involvement the closing agent had, whether she violated her fiduciary duties, and what relevance that has to whether the lenders were misled. It also remains to be explored at trial what precisely was disclosed to or concealed from lenders. In other words, Bartko's status as buyer may have been concealed from lenders, as the indictment states, R. 1 ¶ 18, notwithstanding the closing agent's notary stamp on the acknowledgments.

The acknowledgements further represent that the two properties were being sold "AS IS"; that "the Seller cannot attest to the legality of the upgrades made on the property"; that with respect to one of the properties, "the seller agrees to install a thermostat and heat pump for the attic subsequent to closing"; and that with respect to the other property, "the Seller agrees to fix the closet doors." R. 131-2, 131-3. Bartko testified before the grand jury that "[t]he properties were not in need of work at the time [the straw buyer] purchased them and the funds Jessica provided us had nothing to do with the condition of the properties because the properties were in excellent condition." R. 86-1 at 31. Bartko therefore testified that the checks O'Brien wrote to Bartko and the straw buyer for "a total of $77,836" were payments "for purchasing her two properties," pursuant to an "agreement" that O'Brien, Bartko, and the straw buyer "did not put . . . in writing." *Id.* at 17-18, 23.

O'Brien's alternative position, as implied in her briefs, is that the checks O'Brien wrote to Bartko were not illegitimate payments for purchasing the

properties, but instead were legitimate payments used to make the repairs described in the acknowledgments. In further support, O'Brien emphasizes that the checks had the words "as is" written on them.

Accepting O'Brien's interpretation would inappropriately require this Court to take on the role of fact-finder. The repairs mentioned in the acknowledgements and the words "as is" on the checks may support that some or all of the $77,836 paid by O'Brien to Bartko and the straw buyer was used for repairs. But they also might not. The acknowledgments do not themselves establish that the properties were in need of repair or that funds O'Brien provided were used to make repairs. Indeed, as the government points out, if offered for the truth of the properties' need of repairs, the acknowledgments are inadmissible hearsay. In any event, as the government further points out, the "AS IS" reference in the acknowledgments conflicts with the real estate contracts for both properties, in which the "AS IS" section is crossed out and initialed by O'Brien. R. 144-1 at 9, 144-2 at 9. Furthermore, $77,836 seems like far more than would be required to fix closet doors and install a thermostat and a heat pump in an attic. And even if other repairs were required, $77,836 seems out of proportion with the value of the investment properties, as indicated by the $297,208.96 payoff check allegedly made for one of the properties and the $73,000 mortgage allegedly taken out on the other property. R. 1 at 9-10. But these are all issues for the jury.

Lastly, O'Brien takes issue with Bartko's testimony that "I understood then, as I do now, that if the mortgage lenders knew about the false statements on [the

7

straw buyer's] loan applications they would not have funded the loans." R. 86-1 at 33-34. But the acknowledgments say nothing to contradict this testimony. They do not address Bartko's understanding about what the lenders would have done if they knew that the loan applications contained lies—indeed, the acknowledgements do not provide any information about the alleged false financial statements on the loan applications. In sum, O'Brien has not proven based on the acknowledgements that Bartko's testimony before the grand jury constituted perjury.

Instead, O'Brien has simply shown that the acknowledgements are potentially exculpatory evidence regarding her intent to conceal. *See Williams*, 504 U.S. at 38-39 (in case involving defendant accused of making false statements to a financial institution to obtain loans, general ledgers and tax returns showing that defendant accounted for certain items in a manner consistent with the challenged financial statements constituted exculpatory evidence regarding defendant's "intent to mislead the banks"). And the Supreme Court has clearly held that the government does not need to present exculpatory evidence to the grand jury. *Id.* at 51. The *Williams* Court explained that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." *Id.*; *accord United States v. Gardner*, 860 F.2d 1391, 1395 (7th Cir. 1988) ("[T]he Government is not required to submit exculpatory evidence to a grand jury."). Accordingly, the government's failure to present potentially exculpatory evidence to the grand jury does not violate "one of those few, clear rules" that "ensure the integrity of the

grand jury's functions." *Williams*, 504 U.S. at 46 (quotation marks omitted); *see also Fountain*, 840 F.2d at 513-15 ("supposed perjury" alone was not grounds for dismissing indictment; "[t]he prosecutor [wa]s entitled to present such testimony to the grand jury for whatever it [wa]s worth").

**Prejudice.** In any event, O'Brien has not established prejudice. Again, prejudice occurs where a violation "substantially influenced the grand jury's decision to indict," or "there is a grave doubt that the decision to indict was free from [such] influence." *Bank of Nova Scotia*, 487 U.S. at 263 (quotation marks omitted). The vast majority of the allegations set forth in the indictment were not supported by Bartko's testimony at issue in this motion. Bartko did not testify at all before the grand jury about the 2004, 2005, or 2006 transactions, including about O'Brien's misrepresentations in loan documents made as part of those transactions. And O'Brien does not challenge in this motion the majority of Bartko's testimony regarding the 2007 transactions, including Bartko's testimony that O'Brien and Bartko agreed to use a straw buyer to purchase the properties because Bartko did not have the credit or income to qualify.

O'Brien argues that disclosing the acknowledgements to the grand jury would have discredited the indictment's allegations that O'Brien and Bartko "knowingly caused Bartko's status as a buyer to be concealed from lenders," R. 1 ¶ 18, and that O'Brien and Bartko "fraudulently inflated the sales price of the properties," *id.* ¶ 19. But, for the reasons explained above, the acknowledgements do not conclusively disprove these allegations. The acknowledgements may not have reached the

9

lenders. Bartko's status as buyer appears to have been concealed in the other loan documents. And even if the properties needed a few repairs and were sold as is, that does not mean that the prices were not fraudulently inflated. All of this (as well as the issues regarding Bartko's credibility that O'Brien identifies) remains to be explored at trial. Thus, O'Brien cannot establish a substantial influence on the grand jury's decision to indict.

For these reasons, this Court denies O'Brien's motion to dismiss the indictment based on purportedly perjured grand jury testimony (R. 131).

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: January 17, 2018